# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **PYOTT-BOONE ELECTRONICS INC., ETC.,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:12CV00048 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **IRR TRUST FOR DONALD L. FETTEROLF DATED DECEMBER 9, 1997, ET AL.,** | ) | By: James P. Jones |
| | ) | United States District Judge |
| | ) | |
| Defendants. | ) | |

*Eric D. Brandfonbrener, Perkins Coie LLP, Chicago, Illinois, and Roman Lifson, Christian & Barton, LLP, Richmond, Virginia, for Plaintiff; Thomas M. Wolf and John "Jack" M. Robb, III, LeClairRyan, a Professional Corporation, Richmond, Virginia, for Defendants.*

In this diversity action involving the sale of a Virginia business, the disappointed buyer has sued for damages for breach of the written contract governing the transaction, as well as for related tort claims. Because I find that Delaware law governs the case pursuant to a choice-of-law provision of the contract and because that law does not support the claims made by the plaintiff, I will grant the defendants' Motion to Dismiss. My reasons are as follows.

The plaintiff, Pyott-Boone Electronics Inc. ("PBE"), asserts claims in this case arising from a business transaction in which PBE's predecessor, PBE Acquisition, Inc. ("PBE Acquisition"), purchased from PBE's stockholders all of the outstanding capital stock of the company. After the closing, PBE Acquisition merged into PBE, with PBE being the surviving entity.

The plaintiff's claims include an alleged violation of the Virginia Securities Act, a breach of certain representations contained in the Stock Purchase Agreement dated April 1, 2011 (the "SPA"), as well as fraud claims. The defendants include the IRR Trust for Donald L. Fetterolf Dated December 9, 1997, (the "Donald Fetterolf Trust") and the IRR Trust for M. Mitchell Fetterolf Dated December 9, 1997 (the "Mitchell Fetterolf Trust"), which entities were the majority shareholders of PBE prior to the sale and were parties to the SPA.[1] Other defendants are Donald L. Fetterolf ("Donald") and M. Mitchell Fetterolf ("Mitchell"), individually, who are the trustees of the named trusts and were officers and directors of PBE prior to the sale; Brian Fetterolf ("Brian"), son of Donald and alleged to be in charge of day-to-day operations of PBE prior to the sale; and

---

[1] A small percentage of the stock was held by Nancye Howell, PBE's longtime Vice President, who is not a defendant in this action, although she was a party to the SPA.

-2-

Fetterolf Group, Inc. ("Fetterolf Group"), a party to the SPA referred to therein as "Shareholders [sic] Representative." The Complaint refers to the Donald Fetterolf Trust and the Mitchell Fetterolf Trust as the "Shareholder Defendants," and to Donald, Mitchell, and Brian as the "Control Person Defendants."

This court's subject-matter jurisdiction exists pursuant to 28 U.S.C.A. § 1332(a)(1) (West 2006) and 28 U.S.C.A. §§ 1441(a) and 1446(b) (West Supp. 2012).[2]

The defendants have jointly filed a Motion to Dismiss Complaint with Prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6). The motion has been briefed and orally argued and is ripe for decision.


II

Federal pleading standards require that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a complaint to determine whether the plaintiff has properly stated a claim. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). In order to survive this

---

[2] PBE initially filed this suit in the Circuit Court of Tazewell County, Virginia. The defendants removed the action to this court based upon the parties' diversity of citizenship and the amount in controversy. The plaintiff is a Virginia corporation seeking $17 million in damages from a Pennsylvania corporation and individual citizens of Pennsylvania. The requirements for diversity jurisdiction are therefore satisfied.

Case 1:12-cv-00048-JPJ-PMS   Document 27   Filed 01/15/13   Page 3 of 36   Pageid#: 638

motion, the plaintiff must state "a plausible claim for relief" that permits "the court to infer more than the mere possibility of misconduct" based upon its "judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). In evaluating a pleading, the court accepts as true all well-pled facts and construes those facts in the light most favorable to the plaintiff. *Id.* at 680.

The facts of the case as presented in the Complaint, which I must accept as true for the purpose of deciding the Motion to Dismiss, are as follows.

PBE is located in Tazewell, Virginia, and manufactures mine safety and communications equipment. In April of 2010, the defendants began to market the potential sale of PBE. Among the interested buyers was an investor who would eventually form PBE Acquisition, the vehicle used to facilitate the purchase of PBE. On November 17, 2010, during the course of preliminary investigations and negotiations between these parties regarding a potential sale, the defendants' investment banker sent a document to PBE Acquisition in response to its request for information. This document, which the parties have referred to as the "Distributor Analysis," outlined anticipated future sales opportunities for four major distributors of the Leaky Feeder System ("LFS"), a key PBE product line. PBE Acquisition requested this information from the defendants because for confidentiality reasons, it had agreed to refrain from directly contacting any of PBE's major customers or distributors.

Following negotiations, the relevant parties entered into the SPA. The SPA, which is an exhibit to the Complaint, contains twenty-four pages of express representations and warranties. Appended to the SPA are more than seventy pages of schedules and exhibits, representing the information upon which the parties were to have relied in concluding their agreement. Neither the Distributor Analysis nor the information contained therein was referred to in the SPA or included among the attached schedules and exhibits.

The plaintiff now claims that the Distributor Analysis contained knowing and negligent misrepresentations about the future marketability of PBE's LFS. It alleges that the defendants represented that they expected sales to continue at high levels as a result of new government safety requirements, despite knowing that the majority of mines that had yet to install the required technology had already contracted for installation by a competitor. The plaintiff claims it justifiably and foreseeably relied upon the representations in the Distributor Analysis and has suffered damages as a result of the defendants' misrepresentations.

In its Complaint, the plaintiff asserts eight separate causes of action against the defendants arising out of these facts. Counts One, Two and Three allege violations of the Virginia Securities Act. Count Four alleges breaches of the representations and warranties set forth in sections 3.02(w) and 3.02(r)(i) of the SPA, for which Count Five seeks indemnification. Count Six alleges a breach of

the implied covenant of good faith and fair dealing. Counts Seven and Eight allege fraud, both actual and constructive.

The SPA contains a choice-of-law provision as follows: "This Agreement shall be governed by the laws of the State of Delaware without regard to any jurisdiction's conflicts of laws provisions." (SPA § 12.05(a).)

The defendants have moved to dismiss each of the counts for failure to state a claim for which relief can be granted. *See* Fed. R. Civil P. 12(b)(6).

III

Because it goes to the heart of the plaintiff's action, I will first address Count Four, which alleges a breach of certain of the SPA representations and warranties. "In general, the interpretation of a written contract is a question of law." *Homeland Training Ctr., LLC v. Summit Point Auto. Research Ctr.*, 594 F.3d 285, 290 (4th Cir. 2010). As such, contract interpretation is an appropriate question to be resolved in a motion to dismiss. Given the SPA's choice-of-law provision, I will interpret these provisions of the contract according to Delaware law.

The plaintiff first alleges that the Shareholder Defendants and defendant Fetterolf Group have breached section 3.02(w) of the SPA.[3] According to the

---

[3] Section 3.02(w) of the SPA provides:

-6-

plaintiff, the Distributor Analysis was a statement "furnished to Buyer" in connection with the acquisition. The plaintiff claims that the Distributor Analysis contained untrue statements of material fact and omitted material facts that were necessary to make the document not misleading. The defendants respond that this interpretation of section 3.02(w) is overbroad and inconsistent with other provisions of the SPA.

When interpreting a contract, Delaware courts "strive[ ] to determine the intent of the parties, looking first at the relevant document, read as a whole, in order to divine that intent." *Matulich v. Aegis Commc'ns Grp., Inc.*, No. Civ.A. 2601-CC, 2007 WL 1662667, at *4 (Del. Ch. May 31, 2007) (citing *Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 395 (Del. 1996)), *aff'd*, 942 A.2d 596 (Del. 2008). "In interpreting contract language, clear and unambiguous terms are interpreted according to their ordinary and usual meaning. Absent some ambiguity, Delaware courts will not distort or twist contract language under the guise of construing it." *Allied Capital Corp. v. GC-Sun Holdings, L.P.,* 910 A.2d 1020, 1030 (Del. Ch. 2006) (internal citations omitted). "Moreover, when

---

No representation or warranty by the Company or Stockholders contained in this Agreement, the Schedules attached hereto or in any statement or certification furnished or to be furnished to Buyer pursuant hereto or in connection with the transactions contemplated hereby, contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading.

interpreting a contractual provision, a court should attempt to reconcile all of the agreement's provisions when read as a whole, giving effect to each and every term." *Meso Scale Diagnostics, LLC v. Roche Diagnostics GMBH*, No. 5589-VCP, 2011 WL 1348438, at *8 (Del. Ch. April 8, 2011). "In doing so, courts apply the well settled principle that contracts must be interpreted in a manner that does not render any provision illusory or meaningless." *Schuss v. Penfield Partners, L.P.*, No. 3132-VCP, 2008 WL 2433842, at *6 (Del. Ch. June 13, 2008) (internal quotation marks and citation omitted).

In light of these governing principles of contract interpretation, I find that this claim is founded on an impossibly broad interpretation of section 3.02(w). In order to reach the conclusion that the plaintiff advocates, the warranties contained in section 3.02(w) would effectively encompass every statement any of the defendants ever made to the plaintiff regarding the sale throughout months of negotiations. This interpretation is specifically inconsistent with two other provisions of the SPA.

First, the SPA contains a merger and integration clause in section 12.07.[4] Although the Distributor Analysis made representations about the future health of a

---

[4] Section 12.07 of the SPA provides:

> This Agreement, including the Schedules and Exhibits hereto, together with the Confidentiality Agreement constitutes the entire agreement of the parties hereto respecting its subject matter and supersedes

key PBE product line, the plaintiff did not negotiate the inclusion of such representations to be included among the SPA's many pages of express representations and attached exhibits. The plain language of section 12.07 states that the parties made no representations beyond those specifically included in the agreement. If the plaintiff wished to rely upon the Distributor Analysis, it should have negotiated for its explicit inclusion in the SPA.

Additionally, the Distributor Analysis cannot be characterized as a "document required to be executed and delivered" under the SPA. The defendants, through their investment banker, provided the Distributor Analysis in response to the plaintiff's request for information four months before the parties entered into any agreement. The provisions of the Distributor Analysis could not have been "required" by an agreement that would not exist until months later. Moreover, the agreement between the parties did not create an obligation to provide this information.

---

all negotiations, preliminary agreements and prior or contemporaneous discussions and understandings of the parties hereto in connection with the subject matter hereof. There are no restrictions, promises, representations, warranties, agreements or undertakings of any party hereto with respect to the transactions contemplated by this Agreement, the Confidentiality Agreement, or the Transaction Documents, other than those set forth herein or therein or in any other document required to be executed and delivered hereunder or thereunder.

The plaintiff's interpretation of section 3.02(w) is also inconsistent with the plain terms of section 10.02(i) of the SPA, an anti-reliance clause.[5] In this clause, the plaintiff explicitly disclaimed reliance on information provided to it in fulfillment of due diligence requests or in preparation for the transaction. It is impossible to formulate an interpretation of that disclaimer that would uphold the plaintiff's assertion that section 3.02(w) warrants the type of information presented in the Distributor Analysis. Although section 10.02(i) does exclude information "referenced in" section 3.02, the information contained in the Distributor Analysis cannot possibly be included within that information for the reasons described above.

The defendants advance an interpretation of section 3.02(w) that is both true to its plain language and consistent with these other provisions. This section warrants statements that were made "pursuant to" or "in connection with" the agreement, which must reference documents and statements required to be

---

[5] Section 10.02(i) of the SPA provides:

> Buyer . . . has not relied upon and shall have no claim or right to indemnification . . . and none of the Stockholders shall have or be subject to any liability to Buyer or any other Person with respect to any information, documents or materials furnished by the Stockholders, [PBE] or any of their respective officers, directors, employees, agents or advisors to Buyer . . . relating to [PBE] and any information, documents or material made available to Buyer in fulfillment of due diligence requests, the management presentations or in any other form in expectation of the transactions contemplated hereby, provided, however, that the foregoing shall not apply to any such information included or referenced in Sections 3.01 or 3.02 . . . .

-10-

furnished to the plaintiff prior to the closing date in order to complete the transaction. A statement provided to a prospective buyer over four months before a deal is ultimately struck cannot truly be understood as being "pursuant to" or in connection with some future and hypothetical agreement.

The SPA in this case is a contract negotiated between two counseled and sophisticated parties. The plaintiff's interpretation of section 3.02(w) — the interpretation that would be required to sustain its claim for breach — is unreasonable and inconsistent with the other provisions for which the parties negotiated.[6] The interpretation that would best reflect the intentions of the parties at the time of contracting, in light of the entire agreement and the plain language of these provisions is that statements like the Distributor Analysis were not intended to be within the scope of section 3.02(w). The plaintiff's claim for breach of this provision, therefore, must be dismissed for failure to state a claim.

Count Four of the Complaint alleges with respect to the Distributor Analysis that the Shareholder Defendants and the Fetterolf Group also breached the terms of

---

[6] The plaintiff argues that its interpretation of section 3.02(w) is reasonable because it was prevented from conducting more complete due diligence due to a restrictive Confidentiality Agreement between the parties. Rather than making reasonable an otherwise strained interpretation of the SPA, however, such restrictions would have made more reasonable the inclusion of the Distributor Analysis among the exhibits attached to the SPA.

section 3.02(r)(i).[7]  In order to state a claim under this section of the SPA, the plaintiff must have pleaded facts that would tend to show that at the time of the sale (1) a material change had occurred in PBE's business relationship with at least one of its "Material Customers,"[8] and (2) PBE had notice of this material change or "Material Adverse Effect."[9]

The defendants argue that the plaintiff has not and cannot plead sufficient facts that would tend to show a breach of this section and the claim should be dismissed with prejudice.  I agree that the plaintiff has inadequately asserted a

---

[7] Section 3.02(r)(i) of the SPA provides:

Except as set forth in Schedule 3.02(r)(i) and changes in product and purchasing requests and levels in the ordinary course of business that are consistent with the Company's projections for 2011, there has not been any material change in the Company's business relationship with any of the Material Customers and the Company has not received notice from any Material Customer that said customer intends to terminate its business relationship with the Company, materially reduce, increase, delay, or accelerate any purchases from the Company, materially and adversely change the terms upon which it purchases goods or services from the Company (other than changes in terms and conditions in the ordinary course of business), modify the volume of purchases from the Company in 2011 by more than $100,000 as compared to 2010 levels, or otherwise reflecting a Material Adverse Effect on the business relationship between any such Material Customer and the Company.

[8]  Section 3.02(r)(i) of the SPA defines "Material Customers" to be "the ten (10) largest customers of the Company . . . based on the gross revenues of the Company for the fiscal year ended on December 31, 2010."

[9] The SPA defines a "Material Adverse Effect" to be "any effect that, individually or in the aggregate, is both material and adverse to the financial condition, results of operation, assets or business of the Company, taken as a whole."  (SPA § 1.01.)

-12-

violation of this provision of the SPA. Such facts that have been alleged are not presented in "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). I can only infer "the mere possibility of misconduct," *Iqbal*, 556 U.S. at 679, which is insufficient for pleading purposes. Nevertheless, the facts alleged do not foreclose such a claim and accordingly upon proper motion the plaintiff will be granted leave to amend with regard to its claim under section 3.02(r)(i).[10]

## IV

In Count Six, the plaintiff claims breach of the implied covenant of good faith and fair dealing in connection with the Distributor Analysis. The plaintiff alleges the SPA incorporated this implied covenant and that the Shareholder Defendants breached it by knowingly making untrue statements of material fact and by omitting to state material facts necessary to make other statements not misleading. The plaintiff claims it relied upon these misrepresentations and suffered damages as a result.

---

[10] In Count Five of the Complaint, the plaintiff seeks a declaratory judgment that it is entitled to indemnification from the Shareholder Defendants for the breaches of the SPA it alleged in Count Four. In section 10.02(a)(i)-(iii) of the SPA, the Shareholder Defendants agreed to indemnify the plaintiff against any breaches of the agreement's representations and warranties, even if those claims were to exceed the amount of the purchase price placed into escrow. Because the plaintiff has failed to state a claim alleging a breach of these representations and warranties, it has also failed to state a claim for a declaratory judgment awarding it indemnification. Count Five, therefore, must also be dismissed.

-13-

A covenant of good faith and fair dealing is impliedly incorporated into every contract under Delaware Law. *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986). Courts have characterized this implied covenant as "contractual in nature," noting that it "was created to promote the spirit of the agreement and to protect against one side using underhanded tactics to deny the other side the fruits of the parties' bargain." *Gloucester Holding Corp. v. U.S. Tape & Sticky Prods., LLC*, 832 A.2d 116, 128 (Del. Ch. 2003) (internal quotation marks and citation omitted). Contrary to the defendants' assertion, it does not appear that Delaware courts allow parties to generally disclaim this implied covenant through broad merger and integration clauses. "Express contractual provisions always supersede the implied covenant, but even the most carefully drafted agreements will harbor residual nooks and crannies for the implied covenant to fill." *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 50 A.3d 434, 441 (Del. Ch. 2012). Courts will, however, apply this legal theory "only in narrow circumstances." *Chamison v. HealthTrust, Inc-The Hosp. Co.*, 735 A.2d 912, 921 (Del. Ch. 1999), *aff'd*, No. 392, 1999, 2000 WL 275649 (Del. Mar. 6, 2000). "The implied covenant cannot contravene the parties' express agreement and cannot be used to forge a new agreement beyond the scope of the written contract." 735 A.2d at 921 (citing *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 990 (Del. 1998)). The covenant requires that the parties "deal

-14-

'fairly' in the sense of consistently with the terms of the . . . agreement and its purpose." *ASB Allegiance*, 50 A.3d at 440. "Good faith" envisions "faithfulness to the scope, purpose, and terms of the parties' contract." *Id.* The implied covenant asks "what the parties would have agreed to themselves had they considered the issue in their original bargaining positions at the time of contracting." *Id.*

In this case, the parties did consider the potential for a situation like the one alleged, and they addressed that potential directly in their agreement. These sophisticated parties negotiated for the inclusion of pages of representations and exhibits in the SPA. The parties agreed that they would rely on those representations, and if any of one party's representations proved to be false or misleading, the other party would have a remedy. The parties further agreed that they would not and should not rely on any information that was not included in these representations. Given these carefully negotiated provisions, and the fact that the implied covenant "cannot be used to forge a new agreement beyond the scope of the written contract," the court should refrain from reading in an additional representation in this case. *Chamison*, 735 A.2d at 921. Moreover, the plaintiff has not stated a claim for breach of the express contractual terms, nor has it identified what term it would have the court read into the contract to remedy any insufficiencies. *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 116 (Del. 2006). Absent this showing of a need for an implied term to give effect to

-15-

the original contractual intent of the parties, the plaintiff has not stated a claim for relief under the implied covenant. For that reason, Count Six fails to state a claim upon which relief can be granted.

V

To address the remaining counts of the Complaint, the court must first resolve a dispute between the parties and determine which state's law should apply.

A federal district court sitting in diversity will apply the substantive law of the forum state. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938). The substantive law of the forum state for purposes of *Erie* includes its choice-of-law rules. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941). Therefore, I will apply Virginia's choice-of-law rules.

The parties disagree about what law governs the plaintiff's remaining claims. The choice-of-law provision, section 12.05(a) of the SPA, states, "This Agreement shall be governed by the laws of the State of Delaware without regard to any jurisdiction's conflicts of laws provisions." Virginia courts generally enforce choice-of-law clauses, "unless the party challenging enforcement establishes that such provisions are unfair or unreasonable, or are affected by fraud or unequal bargaining power." *Paul Bus. Sys., Inc. v. Canon U.S.A., Inc.*, 397 S.E.

-16-

2d 804, 807 (Va. 1990). Neither party has claimed that this provision is somehow unfair or affected by fraud.

The plaintiff asserts, however, that its tort claims for fraud and its claims under the Virginia Securities Act fall outside the scope of the SPA's choice-of-law provision and are not subject to Delaware law. The defendants respond that these claims are governed, pursuant to the contractual choice-of-law provision, by Delaware law.

As a threshold issue, the parties disagree as to which state's law — that of the forum state or the state identified in the provision — should be used to determine the scope of the contractual choice-of-law provision. This question is itself a matter of the choice-of-law rules of the forum state. Therefore, this court should determine the scope of a choice-of-law provision in the same manner as the courts of Virginia. It does not appear, however, that any Virginia courts have had occasion to undertake this analysis. It is my responsibility, therefore, to approach this issue in the manner I conclude the Virginia Supreme Court would employ if it were to address the question. *See Wells v. Liddy*, 186 F.3d 505, 528 (4th Cir. 1999) ("To forecast a decision of the state's highest court we can consider, *inter alia:* canons of construction, restatements of the law, treatises, recent pronouncements of general rules or policies by the state's highest court, well considered dicta, and the state's trial court decisions.") .

Jurisdictions across the United States are split regarding what law to apply in defining the scope of a choice-of-law provision. The Second Circuit noted this division of authority in *Finance One Public Co. v. Lehman Brothers Special Financing, Inc.*, 414 F.3d 325, 332-33 (2d Cir. 2005):

> On the one hand, once a court finds that a contractual choice-of-law clause is valid, the law selected in the clause dictates how the contract's provisions should be interpreted, and so arguably that law should also dictate how the choice-of-law clause — which is itself one of the contract's provisions — should be interpreted. . . . More commonly, however, courts consider the scope of a contractual choice of law clause to be a threshold question like the clause's validity. Courts therefore determine a choice-of-law clause's scope under the same law that governs the clause's validity — the law of the forum.

The defendants have cited several cases in which courts have concluded that the scope of a choice-of-law provision is a matter of contract interpretation subject to the law chosen in that provision. The Fourth Circuit reached this conclusion in *Bunker Holdings, LTD v. Green Pacific A/S*, 346 F. App'x 969, 973 (4th Cir. 2009) (unpublished). The Ninth Circuit found the same in *Odin Shipping LTD. v. Drive Ocean V MV*, No. 98-56794, 2000 WL 576436, at *1 (9th Cir. May 11, 2000) (unpublished). Both of these cases, however, were decided under the conflict-of-laws rules of federal maritime law and therefore do not directly inform the analysis that would be appropriate under Virginia law. Additionally, the Supreme Court of California and the Delaware Chancery Court have reached similar conclusions. *Nedlloyd Lines B.V. v. Superior Court*, 834 P.2d 1148, 1154 n.7 (Cal. 1992); *Weil*

-18-

*v. Morgan Stanley DW Inc.*, 877 A.2d 1024, 1032 (Del. Ch.), *aff'd*, 894 A.2d 407 (Del. 2005). The *Weil* court even characterized this approach as a "matter of hornbook law." 877 A.2d at 1032.

On the other hand, it appears that a majority, albeit not an overwhelming one, of courts that have addressed this issue have concluded that the scope of a choice-of-law provision is a threshold issue of enforceability to be decided under forum law. The Eighth Circuit provided perhaps the best justification for this result in *Schwan's Sales Enterprises, Inc. v. SIG Pack, Inc.,* 476 F.3d 594 (8th Cir. 2007). The court concluded that interpreting the scope of a choice-of-law provision under the chosen law rather than forum law "would basically give effect to that provision *before* the court's analytical determination of what effect it should have." *Id.* at 597. The court noted that in the absence of a contrary indication of intention, the law selected in a choice-of-law provision is the "local law" of the state, exclusive of its choice-of-law rules. *Id.* (citing Restatement (Second) of Conflict of Laws § 186 cmt. b (1969)). The court concluded that "[v]alues of certainty of result and ease of application dictate that the forum should apply the local law of the selected state and not concern itself with the complications that might arise if the forum were to apply that state's choice-of-law rules." *Id.*

The Eleventh Circuit similarly applied forum law in its decision in *Rayle Tech, Inc. v. DEKALB Swine Breeders, Inc.*, 133 F.3d 1405, 1409 (11th Cir. 1998).

The court concluded that "[t]he Illinois choice of law provision does not, however, incorporate *all* Illinois law into the contract. No Georgia case has ever held that such a stipulation will bring in the entire body of law of a chosen state." *Id.*; a*ccord Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996) (concluding that New York courts apply New York law to determine the scope of a choice-of-law provision); *Cunningham Charter Corp. v. Learjet, Inc.*, 870 F. Supp. 2d 571, 575 (S.D. Ill. 2012) (applying the conflict-of-laws rules of the forum to determine the scope of a choice-of-law provision); *Cypress Pharm., Inc. v. CRS Mgmt., Inc.*, 827 F. Supp. 2d 710, 724 (S.D. Miss. 2011) (concluding that Mississippi courts "would likely follow the 'more common' view that determining the scope of the choice-of-law provision is a threshold issue to which its law would apply.").

I believe the Virginia court would side with the majority of courts that have concluded that scope is a threshold issue to be determined under forum law. Although applying chosen law may lead to greater certainty in future interpretations of a choice-of-law provision, such an approach is inconsistent with the manner in which modern courts evaluate the enforceability of these provisions. Enforceability is a threshold issue determined according to forum law. Most states give effect to these provisions absent a showing that the chosen law has no substantial relationship with the agreement or would contravene the public policy of the forum state. Restatement (Second) of Conflict of Laws § 187. Courts in

Case 1:12-cv-00048-JPJ-PMS   Document 27   Filed 01/15/13   Page 20 of 36   Pageid#: 655

Virginia enforce these agreements unless the provision is "unfair or unreasonable" or the result of "unequal bargaining power." *Paul Bus. Sys.*, 397 S.E.2d at 807. Whether a provision violated the public policy of a state, or whether it is "unfair or unreasonable," will often depend on the scope of that provision's application and whether it would preclude otherwise meritorious claims. The scope of the choice-of-law provision is, therefore, a necessary part of the threshold inquiry into enforceability. The Virginia Supreme Court, therefore, would be likely to apply the law of Virginia in determining the scope of a choice-of-law provision.[11]

Having decided that Virginia law should apply, I must now estimate how a Virginia court would interpret the scope of a choice-of-law provision. I first look to the foundational principles of Virginia contract law regarding choice-of-law provisions. The Virginia Supreme Court has found contractual choice-of-law provisions enforceable because such provisions effectuate the intent of the contracting parties. *See Tate v. Hain*, 25 S.E.2d 321, 324 (Va. 1943). "[T]his intent whether express or implied, will always be given effect except under exceptional circumstances evincing a purpose in making the contract to commit a

_____

[11] Several other Virginia district courts have applied Virginia conflict-of-laws rules in a similar fashion. *See, e.g., LTD Mgmt. Co. v. Holiday Hospitality Franchising, Inc.*, No. 2:07cv530, 2008 WL 7281926, at *10 (E.D. Va. Mar. 11, 2008) (applying forum law to interpret the scope of a choice-of-law provision selecting Georgia law); *Boston Mut. Life Ins. Co. v. Ludwig*, No. 1:06CV1072(JCC), 2007 WL 1448708, at *4 (E.D. Va. May 10, 2007) (applying forum law to interpret the scope of a choice-of-law provision selecting Pennsylvania law).

fraud on the law." *Id.* at 324 (internal quotation marks and citations omitted). A court interpreting one of these provisions, therefore, should always be guided primarily by its effort to effectuate the intent of the parties as reflected in the language of their agreement.

Sophisticated parties, like the ones in this case, use express contractual choice-of-law provisions "as a business planning device which, if properly executed, should enhance the security of the party expectations and reduce uncertainties in litigation." Robert L. Felix & Ralph U. Whitten, *American Conflicts Law* § 126 (6th ed. 2011). Perhaps the clearest description of this contractual intent is found in a decision from the Supreme Court of California:

> When two sophisticated, commercial entities agree to a choice-of-law clause like the one in this case, the most reasonable interpretation of their actions is that they intended for the clause to apply to all causes of action arising from or related to their contract.
>
> . . . .
>
> . . . When a rational businessperson enters into an agreement establishing a transaction or relationship and provides that disputes arising from the agreement shall be governed by the law of an identified jurisdiction, the logical conclusion is that he or she intended that law to apply to *all* disputes arising out of the transaction or relationship. We seriously doubt that any rational businessperson, attempting to provide by contract for an efficient and businesslike resolution of possible future disputes, would intend that the laws of multiple jurisdictions would apply to a single controversy having its origin in a single, contract-based relationship. Nor do we believe such a person would reasonably desire a protracted litigation battle concerning only the threshold question of what law was to be applied

-22-

to which asserted claims or issues.  Indeed, the manifest purpose of a choice-of-law clause is precisely to avoid such a battle.

*Nedlloyd Lines B.V.*, 834 P.2d at 1153-54.  The courts of Delaware have similarly described contractual intent:

> Parties operating in interstate and international commerce seek, by a choice of law provision, certainty as to the rules that govern their relationship.  To hold that their choice is only effective as to the determination of contract claims, but not as to tort claims seeking to rescind the contract on grounds of misrepresentation, would create uncertainty of precisely the kind that the parties' choice of law provision sought to avoid . . . . To layer the tort law of one state on the contract law of another state compounds that complexity and makes the outcome of disputes less predictable, the type of eventuality that a sound commercial law should not seek to promote.

*ABRY Partners V, L.P. v. F&W Acquisition LLC*, 891 A.2d 1032, 1048 (Del. Ch. 2006).

One writer on the subject has noted that whether choice-of-law provisions encompass torts and other non-contract claims is unsettled.  *See* Peter Hay, et al., *Conflict of Laws* § 18.10 (5th ed. 2010).  Hay notes that a majority of courts have held that choice-of-law provisions do not encompass related torts, but that many courts have reached the opposite conclusion.  *Id.*  Hay has further remarked that, in declining to apply the chosen law to torts, most courts closely follow and apply the language of the clause.  These courts have looked to nuances in contractual language, concluding that a narrowly-drawn clause, providing only that the "agreement" be governed by the law of a certain state, represents a conscious and

negotiated decision by the parties to exclude other causes of action arising in tort or by statute, from its scope of coverage. *See, e.g., Krock,* 97 F. 3d at 645 (stating that there was "no way" to read a choice of law provision indicating that a contract would be governed by a certain body of law broadly enough to apply to fraudulent misrepresentation and other torts). This "formalistic position," however, has significant problems. Hay, *Conflict of Laws* §18.10.

> [T]oo many choice-of-law clauses are poorly or haphazardly drafted (and often wholesale copied from other contracts or cases). As such, these clauses provide a very weak basis from which to safely infer that the parties did or did not contemplate non-contractual issues. Under these circumstances, slavish reliance on the wording of the clauses amounts to an unwise subservience to form over substance and produces random results.

*Id.* Hay, therefore, counsels that courts that have been willing to parse choice-of-law provisions based on nuances of language may actually subvert contractual intent and exacerbate the uncertainty associated with contracting and litigation.

I believe that the Virginia Supreme Court would seek to apply sound commercial law that promotes outcomes consistent with the intent of the parties. For that reason, the scope of a choice-of-law provision should, absent a showing of intent otherwise, be read to encompass all disputes that arise from or are related to an agreement. If parties wish to exclude causes of action arising in tort or by statute from the coverage of their agreement, they may do so, but they should

reflect that intent in their contract. I believe this disposition will most closely reflect the actual intent of the parties at the time they reached their agreement.

Many other courts have reached similar conclusions. In *Northwest Airlines, Inc. v. Astraea Aviation Services, Inc.*, the Eighth Circuit held that claims for misrepresentation and deceptive trade practices fell within the scope of the parties' specification that their agreement be "governed by and interpreted in accordance with" Minnesota law. 111 F.3d 1386, 1392 (8th Cir. 1997). The court noted that, although styled as torts, "[t]hese claims are closely related to the interpretation of the contracts and fall within the ambit of the express agreement . . . ." *Id.* Similarly, the Southern District of Illinois has concluded that "[c]laims involving fraud in the formation of the contract are subject to that contract's choice of law provisions." *Custom Foam Works, Inc. v. Hydotech Sys., Ltd.*, No. 09-cv-0710-MJR, 2011 WL 1102812 at *2 (S.D. Ill. Mar. 23, 2011) (internal quotation marks and citations omitted). The court focused on determining whether the claims at issue were dependent on the contract. The court concluded that claims for misrepresentation, fraud in the inducement, reliance and resulting damages each involved "the formation, interpretation and/or construction of the contract." *Id.* at *3.

These decisions represent a sound approach to determining the scope of a choice-of-law provision. These courts looked to whether the tortious conduct

-25-

arose as a result of the parties' performance or failure to perform under the contract, or whether the tort arose as a result of an obligation imposed by the law independently of the contract. If the legal obligations were independent of the contract, so would be the determination of what law should govern the action. *Accord, Rayle Tech*, 133 F.3d at 1410 ("For an action stemming from a breach of a duty growing out of a contractual relation to be classified as tortious, the breach must be shown to have been a breach of duty imposed by law and not merely the breach of a duty imposed by the contract itself.").

In support of its argument that Virginia law should apply to its non-contract claims, the plaintiff relies upon language in *Hitachi Credit America Corp. v. Signet Bank*, 166 F.3d 614 (4th Cir. 1999). There, applying Virginia choice-of-law rules, the court concluded that a choice-of-law provision calling for the application of Virginia law to "[t]his Agreement and the rights and obligations of the parties hereunder . . . including all matters of construction, validity and performance" was sufficiently broad to encompass contract-related torts. *Id.* at 624 (internal quotation marks and citation omitted). The court stated that the language of the provision indicated an intention to cover more than mere contract claims and, "recognizing the close relationship of the tort claims to the contract," it would apply the chosen law. *Id.* at 628.

-26-

The plaintiff points to the court's statement in *Hitachi* that "[w]here a choice of law clause in the contract is sufficiently broad to encompass contract-related tort claims such as fraudulent inducement, other courts have honored the intent of the parties to choose the applicable law." *Id.* The plaintiff thus implies that this sentence indicates that the provision at issue in this case is one of those provisions that is *not* "sufficiently broad." As I have explained, however, I believe that the choice-of-law provision in this case, when viewed in the context of the entire agreement between these parties, evinces the intent to reduce uncertainty. Given this intention, as well as "the close relationship of the tort claims to the contract," *id.*, applying the chosen law is appropriate.[12]

---

[12] The Eastern District of Virginia has twice considered the import of the Fourth Circuit's holding in *Hitachi*. In *Freedman v. America Online, Inc.*, the court concluded that a choice-of-law provision indicating that not only the agreement but also "your membership" would be governed by the chosen law was sufficiently broad to encompass contract-related torts. 325 F. Supp. 2d 638, 653 (E.D. Va. 2004). In *LTD Management Co., LLC v. Holiday Hospitality Franchising, Inc.*, the court concluded that a contract that stated, "[The Agreement] shall be governed and construed under, and in accordance with the laws . . . of the State of Georgia" was not broad enough to encompass contract-related torts, including fraud. 2008 WL 7281926, at *10. The plaintiff emphasizes the *Freedman* court's statement that "a choice-of-law provision that, by its terms, applies only to the parties' contract or agreement must not be construed to govern the entirety of the parties' relationship and any claim that may arise from that relationship." *Freedman*, 325 F. Supp. 2d at 653. As outlined above, I believe the better reading of *Hitachi* and Virginia contract law would incorporate contract-related torts under the scope of a choice-of-law provision. The *LTD Management Co.* court also made a passing reference to the conflict-of-laws principle of *lex loci delicti*, which generally governs torts in Virginia. 2008 WL 7281926, at *10 n.1. Focusing on this principle, however, would fail to give full effect to the contractual intent of the parties to these agreements and would thereby be inconsistent with Virginia contract law.

For all of these reasons, all of the plaintiff's non-contract claims must be governed by Delaware law pursuant to the SPA's choice-of-law provision.


## VI

Having concluded that Delaware law should apply to all the plaintiff's remaining claims, I now turn to the defendants' motion to dismiss Counts One, Two and Three, which assert claims under the Virginia Securities Act. The defendants argue that the Virginia Securities Act should not apply to an agreement that identifies Delaware law as the governing law. I agree.

The facts presented in this case are analogous to those considered by the District of Delaware in *Organ v. Byron*, 435 F. Supp. 2d 388 (D. Del. 2006). The plaintiff in *Organ* asserted claims arising from the defendants' alleged failure to disclose "critical, adverse facts" related to a merger transaction. *Id*. at 389. The plaintiff contended that he could state claims under the Illinois Security Law, despite the agreement's choice-of-law provision specifying that the merger "and all other aspects of this Agreement" would be governed by Delaware law. *Id.* at 391. The plaintiff argued that its securities claims did not implicate the "merger transaction itself" or "the enforcement and interpretation" of the merger agreement and therefore were not subject to the choice of law provision. *Id.* at 392.

The court declined to give "force to such ambiguous semantic arguments in the application of a choice of law clause" out of concern that it "would contradict Delaware's policy 'to respect the chosen law of the contracting parties, so long as that law has a material relationship to the transaction.'" *Id.* (quoting *ABRY Partners*, 891 A.2d at 1046.). The court further noted that, because the Illinois Securities Law was "virtually identical" to the securities statute in Delaware, application of the choice-of-law provision to the securities claims would not violate Illinois public policy.[13] *Organ,* 435 F. Supp. 2d at 393. Accordingly, the court dismissed the plaintiff's claims under the Illinois Securities Law.

I believe the same analysis should be applied here. As I have described above, I do not believe a Virginia court would parse a choice-of-law provision like the one presented in this case to apply one state's law to contractual claims but another state's law to non-contractual or statutory claims. Moreover, the plaintiff has not made any showing that applying the choice-of-law provision to these claims would be unfair or unreasonable. In substance and effect, the provisions of the Virginia Securities Act under which the plaintiff seeks to state claims appear

---

[13] The case at issue in *Organ* had originally been filed in the Northern District of Illinois until venue was transferred to the District of Delaware. The conflict-of-laws rules of the Northern District of Illinois, therefore, applied to the action before the court. Courts in Illinois will apply a contractual choice-of-law provision, absent a showing that the provision violates Illinois public policy.

Case 1:12-cv-00048-JPJ-PMS   Document 27   Filed 01/15/13   Page 29 of 36   Pageid#: 664

virtually identical to the relevant provisions of the Delaware Securities Act.[14] Although the Commonwealth of Virginia certainly has an interest in this transaction, given that the sale happened in Virginia and the resulting entity is a Virginia corporation, application of the Delaware law would not appear to deprive any Virginia citizens of the protections afforded them by domestic law.

The plaintiff makes the additional argument that it should be permitted to state these claims despite the enforcement of the Delaware choice-of-law provision because state Blue Sky laws are not subject to choice-of-law analyses. Citing a decision from another judge of this court, the plaintiff argues that the only relevant inquiry in the Blue Sky context is whether a particular state has a sufficient factual nexus to the securities transaction. *Lintz v. Carey Manor Ltd.*, 613 F. Supp. 543, 550 (W.D. Va. 1985). In *Lintz*, the court concluded that the securities laws of three states could be applied to a given transaction, so long as such an application did not afford multiple recoveries to the plaintiff. *Id.* at 550-51.

This case must, however, be distinguished from *Lintz*. It does not appear that case involved a choice-of-law provision or that the court considered the effect of a choice-of-law provision on its analysis. It is true that *Lintz* and other cases that have followed it have viewed "[t]he situation created when two state securities law apply to a transaction . . . more as an election of remedies, rather than a

---

[14] *Compare* Va. Code Ann. §§ 13.1-502 and 13.1-522 (2011) *with* Del. Code Ann. tit. 6 §§ 73-201 and 73-605 (West 2012).

-30-

potential conflict of laws problem." *Simms Inv. Co. v. E.F. Hutton & Co.*, 699 F. Supp. 543, 546 (M.D.N.C. 1988). Where the parties have identified the applicable law in a contractual choice-of-law provision, however, it seems clear that they intended to make a selection of remedy *ex ante*. Contractual elections of remedies have been upheld in any number of contexts, and that is the scenario the parties have created for themselves here.

For these reasons, the plaintiff's claims under the Virginia Security Act — Counts One, Two and Three of the Complaint — must be dismissed.


VII

Finally, in Counts Seven and Eight of its Complaint, the plaintiff alleges claims for both actual and constructive fraud. The plaintiff alleges that the defendants made untrue statements of material fact and omitted material facts when their agent provided the Distributor Analysis to the plaintiff. As explained above, these claims are also governed by Delaware law. The defendants argue that, because the plaintiff founds these claims on statements and representations that were made before the time of contracting and were not incorporated into the SPA, they are barred by the SPA's anti-reliance and integration clauses. I agree.

It is clear that Delaware law precludes these types of claims where the parties' written agreement contains clear anti-reliance and integration language.

For example, the Delaware Chancery Court rejected a plaintiff's claim for fraud in the context of a similar agreement in *Great Lakes Chemical Corp. v. Pharmacia Corp.*, 788 A.2d 544, 551 (Del. Ch. 2001). The purchase agreement in *Great Lakes* contained three separate disclaimers all of which mirror those in this case. First, the agreement included a disclaimer of liability for information provided to the buyer in fulfillment of due diligence requests.[15] In addition, the agreement included an anti-reliance clause that substantially follows section 10.02(i) of the SPA in this case.[16] Finally, the purchase agreement in *Great Lakes* contained a disclaimer of all representations and warranties not explicitly included in the agreement, similar to section 12.07 of the SPA in this case.

---

[15] The agreement provided that the seller would not "have or be subject to any liability to the Buyer" for any "information, document, or material made available to the Buyer in certain 'data rooms,' management presentations or any other form in expectation of the transactions contemplated by this Agreement." *Id.* at 552.

[16] This clause provided that the Buyer

has not relied upon . . . and none of the Stockholders shall have or be subject to any liability to Buyer or any other Person with respect to any information, documents or materials furnished by the Stockholders, the Company or any of their respective officers, directors, employees, agents or advisors to Buyer . . . relating to the Company and any information documents or material made available to Buyer in fulfillment of due diligence requests, the management presentations or in any other form in expectation of the transactions contemplated hereby . . . .

(SPA § 10.02(i).)

The court concluded that these disclaimers were both unambiguous and enforceable. The court noted that "two highly sophisticated parties, assisted by industry consultants and experienced legal counsel, entered into carefully negotiated disclaimer language after months of extensive due diligence." *Great Lakes*, 788 A.2d. at 555. This environment of negotiation, therefore, warranted enforcement of a provision disclaiming liability for representations not included in the agreement. "'[W]ere we to permit plaintiffs' use of the defendants' prior representations . . . to defeat the clear words and purpose of the Final Agreement's integration clause, contracts would not be worth the paper on which they are written.'" *Id.* at 555-56 (quoting *One-O-One Enters., Inc. v. Caruso*, 848 F.2d 1283 (D.C. Cir. 1988)). The court added that allowing the assertion "under the rubric of fraud, [of] claims that are explicitly precluded by contract, would defeat the reasonable commercial expectations of the contracting parties and eviscerate the utility of written contractual agreements." *Great Lakes,* 788 A.2d at 556. The *Great Lakes* court's analysis has been subsequently reviewed and approved by a number of courts. *See, e.g., Hovis v. Gen. Dynamics Corp.* (*In re Marine Energy Sys. Corp.*), 299 F. App'x 222, 231 (4th Cir. 2008) (unpublished) (construing Delaware law); *RAA Mgmt., LLC v. Savage Sports Holdings, Inc.*, 45 A.3d 107, 113 (Del. 2012).

I believe the same analysis is appropriate here. Perhaps the plaintiff regrets failing to negotiate for the explicit inclusion of the information presented to it in the Distributor Analysis, but this regret cannot serve as the basis for its fraud claims. The plaintiff cannot justifiably have relied on information when it has already contractually promised not to rely.[17]

The plaintiff adds two collateral arguments that cannot save its claims. First, the plaintiff submits that, because it has alleged omissions on the part of the defendants, it need not prove that it justifiably relied on any statements of the defendants. The plaintiff cites a decision from the Southern District of Florida, which held that in fraud cases "involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery." *Sierra Equity Grp., Inc. v. White Oak Equity Partners, LLC*, 650 F. Supp. 2d 1213, 1233 (S.D. Fla. 2009). The fatal flaw in this argument is apparent on the face of this sentence. The plaintiff primarily alleges in this Complaint that the defendants made false representations in the Distributor Analysis, and thereby omitted to make representations about the true state of the plaintiff's future business opportunities.

---

[17] It should be noted that section 3.02(w) of the SPA specifically provides that, except for the explicit representations of the SPA, "Buyer understands and agrees that neither the Company, any Stockholder nor anyone acting on their respective behalf makes any express or implied representations or warranties with respect to the Company or its business assets." The plaintiff, therefore, cannot claim that it justifiably relied on any extra-contractual statements, even those of the individual defendants who were not actual parties to the SPA. Donald, Mitchell and Brian Fetterolf are, therefore, third party beneficiaries of the terms of this anti-reliance provision. Any claims for fraud against these individual defendants are subject to the analysis I have outlined above.

According to the plaintiff's analysis, any misstatement of fact would necessarily also involve an omission of truth. Applying the law in this manner would eviscerate the justifiable reliance requirement of fraud and negligent fraud claims. This argument cannot succeed.

The plaintiff has further averred in its Complaint that its reliance on the Distributor Analysis was justified by its inability to conduct its own due diligence as a result of the parties' Confidentiality Agreement. The defendants correctly point out that Delaware courts have not found such a prohibition to support reliance on due diligence when the parties have promised not to rely. *See Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co.*, No. 19209, 2002 WL 1558382, at *8 (Del. Ch. July 9, 2002). Rather than relying on due diligence not included in the agreement, the plaintiff could simply have walked away from the transaction if it believed the risk to be too high, or the plaintiff could have negotiated for the inclusion of this information in the agreement.

The plaintiff further argues that sections 12.07 and 10.02(i) are not sufficiently clear to function as anti-reliance clauses for purposes of disclaiming this form of liability. Under Delaware law:

> For a contract to bar fraud claims, the contract must contain language that, when considered in the context of the contract as a whole, can be said to constitute a clear anti-reliance clause by which the plaintiff has promised contractually that it did not rely upon statements outside the contract's four corners in deciding to sign the contract.

*Addy v. Piedmonte*, No. 3571-VCP, 2009 WL 707641, at \*19 (Del. Ch. Mar. 18, 2009).  The plaintiff claims that the language of sections 3.02(w) and 3.02(r)(i) makes the anti-reliance provisions in the SPA unclear and thereby ineffective to disclaim liability.  This argument is founded upon an interpretation of these contractual provisions that I have already analyzed and rejected.  For that reason, I find that the anti-reliance provision in section 12.07 of the SPA in this case is clear and precludes the plaintiff's claim for fraud.

Counts Seven and Eight of the Complaint must, therefore, be dismissed.

VIII

For the reasons stated, the defendants' Motion to Dismiss will be granted. Provided that the plaintiff files a timely motion seeking to amend its Complaint, leave will be granted to amend as to the claim presently set forth in Count Four alleging a breach of section 3.02(r)(i) of the SPA.[18]

A separate Final Order will be entered herewith.

DATED:  January 15, 2013

/s/  James P. Jones
United States District Judge

---

[18]   The plaintiff alternatively moved the court to strike the plaintiff's demand for a jury trial, based upon a waiver contained in section 12.05(c) of the SPA.  Because of my ruling on the Motion to Dismiss, it is not necessary for me to consider this alternative motion and it will be considered moot.