## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| PYOTT-BOONE ELECTRONICS INC., a Virginia corporation (f/k/a PBE ACQUISITION, INC.), | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | |
| IRR TRUST FOR DONALD L. FETTEROLF DATED DECEMBER 9, 1997; IRR TRUST FOR M. MITCHELL FETTEROLF DATED DECEMBER 9, 1997; FETTEROLF GROUP, INC.; DONALD L. FETTEROLF, individually and as Trustee for the IRR Trust for Donald L. Fetterolf, dated December 9, 1997; M. MITCHELL FETTEROLF individually and as Trustee for the IRR Trust for M. Mitchell Fetterolf, dated December 9, 1997; and BRIAN FETTEROLF, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 1:12-cv-00048-JPJ-PMS  Judge James P. Jones |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

Plaintiff Pyott-Boone Electronics Inc. ("PBE" or "Plaintiff"), formerly known as PBE

Acquisition, Inc. ("PBE Acquisition"), by and through its attorneys, brings this action against

Defendants, IRR Trust for Donald L. Fetterolf Dated December 9, 1997; IRR Trust for M.

Mitchell Fetterolf Dated December 9, 1997; the Fetterolf Group, Inc.; Donald L. Fetterolf

(individually and as trustee of the IRR Trust for Donald L. Fetterolf Dated December 9, 1997);

M. Mitchell Fetterolf (individually and as trustee of the IRR Trust for M. Mitchell Fetterolf

Dated December 9, 1997); and Brian Fetterolf (individually) (collectively, the "Defendants") and,

for its Complaint, states as follows:

## PRELIMINARY STATEMENT

1.         PBE is a leading manufacturer of mine safety, productivity and communications equipment based in Tazewell, Virginia.  On April 1, 2011, PBE Acquisition acquired all of the outstanding capital stock of PBE (the "Stock") pursuant to a Stock Purchase Agreement (the "SPA").  The SPA without its exhibits is attached hereto as Exhibit A.  In the SPA, and in connection with the sale of the Stock, the above-named Defendants directly and/or through their authorized agents made representations and warranties of material fact that were untrue, and that the Defendants knew or should have known were untrue.  Further, Defendants omitted to state in the SPA material facts necessary to make the Defendants' representations and warranties in the SPA not misleading.  Defendants knew or should have known that these omitted facts were necessary to make Defendants' representations and warranties in the SPA not misleading.  Defendants made these representations and warranties, and omitted to state material facts in the SPA, to induce Plaintiff to purchase the Stock at an inflated price.  Plaintiff  became aware that Defendants' representations and warranties in the SPA were untrue after it acquired the Stock.  Had Defendants disclosed all material facts in the SPA, Plaintiff would either have abandoned the transaction or paid a lower purchase price for the Stock.

### PARTIES

2.         At all times relevant to this Action, Plaintiff Pyott-Boone Electronics, Inc. is a Virginia corporation with its principal place of business located at 1459 Wittens Mill Road, North Tazewell, Virginia.

3.         PBE Acquisition, Inc. was formed to acquire PBE.  PBE merged with PBE Acquisition, Inc. at or about the time of the acquisition on April 1, 2011.  Following the Merger,

PBE as the surviving entity succeeded to and assumed all the rights, duties and obligations of PBE Acquisition, Inc. under the SPA.

4.     Defendant IRR Trust for Donald L. Fetterolf Dated December 9, 1997 (the "Donald Trust") is a Pennsylvania trust.  At all times relevant to this Complaint, individual defendant, Donald L. Fetterolf, acted as the sole Trustee for the Donald Trust.

5.     Defendant IRR Trust for M. Mitchell Fetterolf Dated December 9, 1997 (the "Mitchell Trust") is a Pennsylvania trust.  At all times relevant to this Complaint, individual defendant, M. Mitchell Fetterolf, acted as the sole Trustee for the Mitchell Trust.

6.     Defendant Fetterolf Group, Inc.("Fetterolf Group"), is a Pennsylvania corporation with its principal place of business located at 227 New Centerville Road, Somerset, Pennsylvania.

7.     Defendant Donald L. Fetterolf ("Donald Fetterolf") is an individual residing at 627 New Centerville Road, Somerset, Pennsylvania.  Donald Fetterolf is the trustee of the Donald Trust.

8.     Defendant M. Mitchell Fetterolf ("Mitchell Fetterolf") is an individual residing at 118 N. Morris Street, Saint Clair, Pennsylvania.  Mitchell Fetterolf is the trustee of the Mitchell Trust.

9.     Defendant Brian Fetterolf ("Brian Fetterolf") is an individual residing in or around Somerset, Pennsylvania.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), there being complete diversity of citizenship between the parties and the matter in controversy exceeding the sum or value of $75,000, exclusive of interest and costs.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a), because: Defendants engaged in purposeful activity in Tazewell, Virginia in connection with the operation and sale of PBE, a Virginia corporation located in Tazewell, Virginia; Defendants engaged in the formation and performance of the SPA, including negotiations and communications, in Tazewell, Virginia; and Defendants engaged in the misconduct at issue in this Complaint in part in Tazewell, Virginia.

## FACTS COMMON TO ALL CLAIMS

**Background**

12.     PBE was established in 1971 by Frank Pyott and Roger Boone.  PBE designs, manufactures and markets technologically advanced, reliable, electronic monitoring and communication products to the underground mining industry throughout the world.

13.     PBE was acquired by the Fetterolf Group in 1977.  In early 2010, in preparation for the sale of the Stock, the Fetterolf Group's interest in PBE was transferred to the Mitchell Trust and the Donald Trust.

14.     In or about April 2010, Defendants began marketing the sale of all of the Stock of PBE.  Plaintiff acquired all such stock for approximately $70 million on April 1, 2011.

15.     Before the sale of the Stock to Plaintiff, defendants the Donald Trust and the Mitchell Trust (hereinafter, the "Stockholder Defendants") owned 99.8% of the Stock of PBE.

16.      Nancye Howell ("Howell"), an individual stockholder, owned 0.2% of the Stock before the PBE acquisition.  Ms. Howell continued to serve as Vice President of PBE  during the relevant time period following PBE's acquisition.

17.      At the time Defendants sold the Stock to Plaintiff, individual Defendant Donald Fetterolf acted as President, Chief Executive Officer, Chairman of the Board of Directors of PBE; individual Defendant Mitchell Fetterolf acted as Secretary and Treasurer; and Brian Fetterolf (the son of Donald Fetterolf) acted as Donald and Mitchell Fetterolf's designee in the day-to-day operations of PBE (hereinafter, the "Control Person Defendants").  These individuals, and the entity through which they coordinate and act, the Fetterolf Group,  materially aided in the sale of the Stock to Plaintiff.

18.      Defendant Fetterolf Group functioned as the representative for the Stockholder Defendants materially aided in the sale of the Stock to Plaintiff.

19.      The Fetterolf Group is owned and/or controlled by the Control Person Defendants.

**Defendants Marketed PBE's LFTS Product Line**
**as an Integral Component of the  Company's Business**

20.      A leading product line of PBE in 2009 and 2010 was its mine safety product referred to as a Leaky Feeder and Tracking System (sometimes also referred to as a Leaky Feeder System) (collectively "LFTS"), which is a wireless radio and tracking system that allows communication over vast distances in underground mining environments.  For purposes of this Complaint, unless otherwise indicated, all references to LFTS include both systems referred to as Leaky Feeder and Tracking systems and Leaky Feeder Systems, and include the systems developed and sold by PBE and the similar communications and tracking systems sold by PBE's competitors.

21.      PBE's LFTS is comprised of several systems which together allow mine-wide radio communications in excess of sixty miles.  PBE's LFTS is certified by the U.S. Department of Labor's Mine Safety and Health Administration ("MSHA").

22.      Sales  by PBE of LFTS to retrofit existing, operating mines represents a much greater revenue source than sales to new, start-up mines because of the larger volume of equipment required to retrofit existing mines as compared to the small volume of equipment required to equip a new, start-up mine.

23.      In 2010, PBE experienced increased sales of LFTS to existing, operating mines primarily because these mines were required to install communications systems such as LFTS pursuant to the Mine Improvement and New Emergency Response Act of 2006 (sometimes referred to as the MINER Act), 30 U.S.C. § 801, *et seq.*

24.      In 2010, PBE's orders of LFTS, which primarily consisted of orders for LFTS products for use in existing, operating mines, accounted for approximately 60% of PBE's total mining-related orders.

**The Representations and Warranties of the SPA**

25.      On or about April 1, 2011, Plaintiff entered into the SPA with the Company and the Stockholder Defendants and purchased the Stock.

26.      In Section 3.02 of the SPA, the Stockholder Defendants made numerous representations and warranties to the buyer as of the April 1, 2011, Closing Date.

27.      In Section 3.02(r)(i) of the SPA, the Stockholder Defendants represented and warranted that Schedule 3.01.(r)(i) of the SPA contained a list "of the ten (10) largest customers of the Company (the "Material Customers") based on the gross revenues of the Company for the fiscal year ended on December 31, 2010 for each such Material Customer during such period."

28.     In Section 3.02(r)(i), the Stockholder Defendants further represented and warranted that, except as set forth in Schedule 3.02(r)(i) and changes in product and purchasing requests and levels in the ordinary course of business that were consistent with PBE's projections for 2011:

     a.   There had not been any material change in PBE's business relationship with any of the Material Customers;

     b.   PBE had not received notice from any Material Customer that the customer intended to materially reduce any purchases from PBE;

     c.   PBE had not received notice from any Material Customer that the customer intended to modify any volume of purchases from PBE in 2011 by more than $100,000 as compared to the 2010 levels reflected on Schedule 3.02(r)(i); and

     d.   PBE had not received notice from any Material Customer of changes that otherwise reflected a "Material Adverse Effect" on the business relationship between such customer and the Company.

29.     In Section 1.01 of the SPA, the parties defined "Material Adverse Effect" to mean, "with respect to the Company, any effect that individually or in the aggregate, is both material and adverse to the financial condition, results of operation, assets or business of the Company, taken as a whole."

30.     In Section 3.02(w) of the SPA, the Stockholder Defendants represented and warranted that "[n]o representation or warranty by the Company or Stockholders contained in this Agreement, the Schedules attached hereto or in any statement or certification furnished or to be furnished to Buyer pursuant hereto or in connection with the transactions contemplated hereby, contains or will contain any untrue statement of a material fact or omits or will omit to

state a material fact necessary to make the statements contained herein or therein not misleading."

31.      In Section 7.01(a) of the SPA, the Stockholder Defendants agreed that the obligations of the buyer to complete its purchase of the Stock was subject to the condition that each of the representations and warranties of the Stockholders and the Company set forth in Section III of the SPA "shall be true and correct in all material respects (except for representations and warranties qualified by materiality or Material Adverse Effect, which shall be true and correct in all respects)" on the date of the SPA and as of the closing date.

**PBE's Material Customers and Their LFTS Sales**

32.      In 2009 and 2010, PBE made most of its LFTS sales through a handful of distributors who sold LFTS primarily to coal mine owners and operators within the states of Kentucky, Alabama, Illinois, Virginia, West Virginia, Ohio, Pennsylvania, and Maryland, and to two major customers.

33.      These major distributors and customers of PBE's LFTS products were listed as Material Customers in Schedule 3.02(r)(i) of the SPA.

34.      Approximately 60% of the 2010 orders from the major distributors and customers identified on Schedule 3.01(r)(i) was attributable to orders for PBE's LFTS.

**Defendants' Knowledge of the Limited Remaining Market for LFTS**

35.     In November 2010, Defendants performed a survey of certain of its major distributors of LFTS for the stated purpose of determining the remaining market for sales of LFTS to existing, operating mines.  At least four months prior to signing the SPA, Defendants and the Company were on notice as a result of this survey, and hence knew or should have known, that the sale of LFTS to existing, operating coal mines (and sales through its major distributors and to its major customers of these products) would be substantially declining in 2011 and beyond.

36.     Specifically, on November 12, 2012, Nancye Howell, Vice-President of PBE, reported to Brian Fetterolf  by email of the same date the outcome of a survey that she had conducted of four major distributors (identified here as Distributors A-D to preserve confidentiality).  A redacted copy of Ms. Howell's email is attached to her declaration, which is attached hereto as Exhibit B.

37.     In the course of performing her survey of major distributors, Ms. Howell learned and/or determined the following:

      a.   Distributor A reported that of the 350 mines operated by its customers, LFTS equipment had not been installed in 50 mines. With respect to these 50 mines, the customers (i) were awaiting MSHA approval of a PBE competitor's LFTS system; or (ii) had already purchased and received an LFTS system from a PBE competitor and were merely awaiting installation.  There were many fewer than 50 existing, operating mines available as candidates for the purchase and installation of LFTS from PBE.

b.  Distributor B reported that of the 100 mines operated by its customers, LFTS equipment had not been installed in 25-30 mines. With respect to these 25-30 mines, however, (i) one customer had already purchased for installation 15 systems from a PBE competitor; and (ii) with respect to the remaining 10-15 mines, some of the operators were awaiting MSHA approval of an LFTS system from one of PBE's competitors.  There were many fewer than 25-30 existing, operating mines available as candidates for the purchase and installation of LFTS from PBE.

c.  Distributor C reported that of the 350-400 mines operated by its customers, LFTS had not been installed in just 7 mines.  Of these mines, the operator had already purchased 6 LFTS and was merely awaiting installation, leaving only one existing, operating mine as a candidate for the sale and installation of LFTS from PBE.

d.  Distributor D indicated that all of its existing, operating mine customers had installed the communication and tracking systems.   With respect to the sale of LFTS to new mines, she indicated that there was only one operator reportedly opening a new mine with four more planned.  She reported that Distributor D had informed her that a competitor of PBE was bidding the installation of LFTS for the new mines with drastic price reductions.  Ms. Howell concluded and informed Mr. Fetterolf that this suggested that PBE could be facing declining margins on its sales of equipment for new mines.

e.  Ms. Howell reported that in ascertaining the potential market for LFTS sales through Distributors A-D, the Company could not add the numbers of potential mines having no LFTS system either installed or purchased for installation as the

available market.  To do so would overstate the available market because the

territories and customers covered by Distributors A-D overlapped.

38.     Brian Fetterolf and the Company received the results of Ms. Howell's survey.  In

an email from the Defendants' investment banker dated November 17, 2010, attached hereto in

redacted form as Exhibit C (the "Distributor Survey"), the Company stated that "Management

called four of their top distributors to obtain market data. Below are the highlights from the

conversations from each distributor."  Brain Fetterolf, Ms. Howell, and Michael Thompson,

General Manager of PBE, were "open" copied on this email from the Shareholder Defendants'

investment banker.

39.     The information as reported in the Distributor Survey was materially different

from the information provided by Ms. Howell to Brian Fetterolf three days earlier.  Instead,  the

Shareholder Defendants, through their investment banker and Brain Fetterolf, falsely reported

that that PBE management had conservatively estimated that the market for the sale of LFTS to

existing underground coal mines was approximately 100 mines, and that PBE was estimated

conservatively to acquire 20% of that market, or the sale of four LFTS units each year over the

period 2011-15.

40.     Following receipt of Ms. Howell's information, Brian Fetterolf (individually and

as the representative of the Stockholder Defendants) and the Company knew or should have

known that the market for the sale of PBE's LFTS to existing, operating coal mines had been

completely saturated and that this circumstance constituted a known and anticipated material

change in PBE's business relationship with its Material Customers.

41.     Following receipt of Ms. Howell's information, Brian Fetterolf (individually and

as the representative of the Stockholder Defendants) and the Company had received notice and

knew or should have known that its Material Customers intended to materially reduce their purchases from PBE.

42.     Following receipt of Ms. Howell's information, Brian Fetterolf (individually and as the representative of the Stockholder Defendants) and the Company had received notice and knew or should have known that its Material Customers intended to materially or adversely change the terms upon which they purchased goods or services from PBE.

43.     Following receipt of Ms. Howell's information, Brian Fetterolf (individually and as the representative of the Stockholder Defendants) and the Company had received notice and knew or should have known that its Material Customers intended to modify the volume of purchases from PBE in 2011 by more than $100,000 as compared to 2010 levels.

44.     Following receipt of Ms. Howell's information, Brian Fetterolf and the Company had received notice and knew or should have known of changes that otherwise reflected a "Material Adverse Effect" on the business relationship between its Material Customers and the Company.

45.     Following receipt of Ms. Howell's information, and until the closing date of April 1, 2011 when the Stockholder Defendants executed the SPA, a material change had occurred in PBE's business relationship with at least one of PBE's Material Customers, and the Defendants knew, and the Company had received notice, of this material change and its Material Adverse Effect.

**Untrue Representations and Warranties and Omissions of**
**Material Facts In the SPA**

46.     As of the April 1, 2011 Closing Date, the Stockholder Defendants knew or should

have known that their representations and warranties in Section 3.02(r)(i) were untrue and

misleading due to the omission of material facts.

47.     After buying PBE, Plaintiff learned from employees, to its surprise, that

management did not foresee any more orders for new installations of LFTS communications

systems to existing, operating mines and that Defendants knew this when they executed the SPA.

*See* Declarations of Gary Sargent and Nancye Howell (Exs. B and D hereto).

48.     After it bought PBE, Plaintiff learned that Ms. Howell had told Brian Fetterolf

that most of the existing, operating coal mines represented by PBE's distributors had *already*

purchased the equipment or were waiting for the imminent government approval of a system

offered by PBE's competitors.

49.     In 2010, PBE's sales of LFTS products for initial installations in existing,

operating mines constituted a material part of its mining-related sales.

50.     After acquiring the Stock, Plaintiff has not received a *single* order for a new LFTS

initial installation to an existing, operating mine.

51.     Since April 1, 2011, none of the major distributors and customers listed on

Schedule 3.02(r)(i) has ordered any LFTS for an initial installation in an existing operating mine.

52.     Because there was no more demand for initial installations among existing,

operating mines in 2011, PBE's orders for LFTS materially declined in 2011 as compared to

2010, dropping by approximately 23%.  Orders for LFTS further materially declined in 2012 as

compared to 2010, dropping by approximately 63%.

53.      The Stockholder Defendants made the following untrue representations and warranties in Section 3.02(r)(i) of the SPA:

    a.   That there had not been any material change in PBE's business relationship with any of the Material Customers;

    b.   That PBE had not received notice from any Material Customer that the customer intended to materially reduce any of  its purchases form PBE;

    c.   That PBE had not received notice from any Material Customer that the customer intended to modify any volume of purchases from PBE in 2011 by more than $100,000 as compared to the 2010 levels reflected on Schedule 3.02(r)(i); and

    d.   That PBE had not received notice from any Material Customer of changes that otherwise reflected a "Material Adverse Effect" on the business relationship between such customer and the Company.

54.      Schedule 3.02(r)(i) of the SPA makes no exceptions for any material change in the Company's business relationship with any of its Material Customers, and does not provide a description of any notice received by any of the Defendants or the Company from any Material Customer of (i) material reductions in purchases from the Company, (ii) adverse changes in the terms upon which they proposed to  purchase goods or services from the Company, (iii) modifications of the volume of purchases from the Company in 2011 by more than $100,000 as compared to 2010 levels, or (iv) changes that otherwise reflecting a Material Adverse Effect on the business relationship between any such Material Customer and the Company.

55.      Defendants failed to disclose in the SPA material information in their possession that clearly demonstrated that effectively all of the existing, operating mine customers of PBE's

major distributors had already purchased communications and tracking systems or were

contracted to purchase LFTS from PBE's competitors for their existing, operating mines.

56.        The Stockholder Defendants' representations and warranties in Section

§ 3.02(r)(i),of the SPA were untrue and omitted material facts necessary in order to make the

statements made therein, in light of the circumstances under which they were made, not

misleading.

57.        The Stockholder Defendants' untrue representations and warranties in Section

3.02(r)(i) of the SPA, and their omission of material facts in Section 3.02(r)(i) necessary in order

to make the statements made not misleading, caused Plaintiff significant harm.  Because

effectively all of the existing, operating mines of PBE's major distributors had already purchased

communications and tracking systems, or were seeking to do so from PBE competitors, Plaintiff

has not received, and cannot receive, the expected revenues for sales of installations of these

systems.

58.        Plaintiff bought PBE relying on the representations and warranties of Section

3.02(r)(i) of the SPA, which portended continuity of Material Customer business relationships

and of sustained purchases in 2011.

59.        In reliance on Defendants' representations and warranties, Plaintiff also agreed to

purchase certain LFTS inventory (in an amount exceeding $4.5 million) that would only be used

if the LFTS sales to existing, operating mines occurred.

60.        The Stockholder Defendants knew or should have known in the exercise of

reasonable care of these untruths and omissions at the time of SPA and the Closing Date.

61.     The Stockholder Defendants intended Plaintiff to rely on their untrue statements and omissions in Section 3.02(r)(i) of the SPA in purchasing Defendants' Stock, which Plaintiff justifiably did.

62.     The Control Person Defendants were the trustees of the Stockholder Defendants, were officers and/or directors of the Company or occupied a similar status or performed similar functions thereof, and materially aided in the sale of the Stock.

63.     By reason of their positions at PBE and relationships to the Company, the Control Person Defendants had continual access to, and knowledge of, PBE's private, corporate, and business information, including adverse, non-public information concerning PBE's product lines, the LFTS market, PBE's financial condition, and future prospects.

64.     The Control Person Defendants knew or in the exercise of reasonable care could have known at the time of the acquisition that the representations and warranties in Section § 3.02(r)(i),of the SPA were untrue and misleading, and contained omissions of material fact that that if revealed would have made the untrue statements not misleading.

65.     The Defendants collectively participated in the drafting, preparation, approval, and dissemination of the representations and warranties complained of herein.

66.     Plaintiff reasonably relied upon the representations and warranties in Section 3.02(r)(i) of the SPA , for among other reasons, because of the Defendants' superior position and background with respect to the company and its business and because the Stockholder Defendants represented in the SPA that every material statement by them to Plaintiff in the SPA were true, accurate and complete. *See* SPA at § 3.02(w).

- 16 -

**Plaintiff Obtained Defendants' Stock at an Inflated Purchase Price**

67.     Under the SPA, PBE Acquisition purchased all outstanding stock of PBE for the purchase price consisting of $65,930,000.00 in cash (subject to certain working capital and net cash adjustments) and the issuance of 2,070,000 Preferred Units and 2,070,000 Class A Units in PBE Holdings, LLC (the "Interests") (such Interests were issued as follows: (A) One Million Preferred Units and One Million Class A Units to the Donald Trust; (B) One Million Preferred Units and One Million Class A Units to the Mitchell Trust; and (C) Seventy Thousand Preferred Units and Seventy Thousand Class A Units to Nancye Howell (Vice President of PBE).

68.     As a result of Stockholder Defendants' untrue representations and warranties in the SPA, and omission of material facts, Plaintiff has been injured.  In reliance on these representations and warranties, Plaintiff paid an excessive price for the Stock - more than it would have paid had it been provided accurate and complete information by the Defendants.

69.     Pursuant to section 2.02(h) of the SPA, PBE Acquisition deposited $5,100,000 of the purchase price into an escrow account (the "Escrow Account") established with JP Morgan Chase Bank, N.A. (the "Escrow Agent") under the terms of an Escrow Agreement in the form attached to the SPA (the "Escrow Agreement").  (Two other, separate escrows were created at the same time pursuant to the SPA:  a $450,000 working capital escrow and a $10,000,000 tax escrow.)

70.     By letter dated November 7, 2011, Plaintiff submitted a notice of claim to Defendants and the Escrow Agent for losses exceeding the full amount of the Escrow Account ($5.1 million) (the "Claim Notice") based on the misrepresentations to Plaintiff.  Pursuant to the parties' agreement, the Escrow Agent is obligated to hold the escrow until it receives a joint

- 17 -

direction letter signed by the Fetterolf Group and Plaintiff or until it receives a final determination from a court directing the Escrow Agent to disburse the escrow.

71.     By letter dated December 2, 2011, Defendants, through their legal counsel, notified Plaintiff that they disputed and denied the Claim Notice, and further demanded a formal withdrawal of the Claim Notice.

72.     In a response letter dated February 15, 2012, Plaintiff reiterated its claim for damages.  Subsequent discussions among the parties have been unable to resolve the issues.

73.     Shortly after the Court's January 15, 2013 ruling on Plaintiff's original complaint, Defendants wrote to the escrow agent and erroneously claimed that the January 15, 2013 ruling was a final resolution of the parties' dispute and demanded, in contravention of the plain terms of the parties' Escrow Agreement, that the Escrow Agent release all funds in the Escrow Account. The Escrow Agent declined to follow Defendants' improper request.

**COUNT I**
**(Breach of Contract – Representations & Warranties)**
**Against the Stockholder Defendants**

74.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 73 above as if set forth herein.

75.     Under the terms of the SPA, Section 3.02(w) (Ex. A), the Stockholder Defendants agreed that:

> No representation or warranty by the Company or Stockholders contained in this Agreement, the Schedules attached hereto or in any statement or certification furnished or to be furnished to Buyer pursuant hereto or in connection with the transactions contemplated hereby, contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading.

76.         Under the terms of the SPA, Section 3.02(r)(i) (Ex. A), the Stockholder

Defendants agreed that

> Except as set forth in Schedule 3.02(r)(i) and changes in product and purchasing
> requests and levels in the ordinary course of business that are consistent with the
> Company's projections for 2011, there has not been any material change in the
> Company's business relationship with any of the Material Customers and the
> Company has not received notice from any Material Customer that said customer
> intends to terminate its business relationship with the Company, materially
> reduce, increase, delay, or accelerate any purchases from the Company, materially
> and adversely change the terms upon which it purchases goods or services from
> the Company (other than changes in terms and conditions in the ordinary course
> of business), modify the volume of purchases from the Company in 2011 by more
> than $100,000 as compared to 2010 levels, or otherwise reflecting a Material
> Adverse Effect on the business relationship between any such Material Customer
> and the Company.

77.         Schedule 3.02(r)(i), as incorporated into the SPA, contained a list of 10 Material

Customers as of December 31, 2010.  Included in Schedule 3.02(r)(i), are the major distributors

and two major customers of PBE that accounted for most of the sales of LFTS to existing,

operating mines in 2010.

78.         Schedule 3.02(r)(i) of the SPA makes no exceptions for any material change in the

Company's business relationship with any of its Material Customers and does not provide a

description of any notice received by the Company from any Material Customers of such

customers' intention to (i) make material reductions in any purchases from the Company, (ii)

impose adverse changes in the terms upon which they proposed to  purchase goods or services

from the Company, or (iii) make modifications of the volume of purchases from the Company in

2011 by more than $100,000 as compared to 2010 levels, or of changes otherwise reflecting a

Material Adverse Effect on the business relationship between any such Material Customer and

the Company.

79.      As of the signing of the SPA, the Stockholder Defendants knew or should have known that there were existing material changes in the Company's business relationship with its Material Customers and that they had received notice from PBE's Material Customers (i) that they intended to make material reductions in purchases from the Company, (ii) that they intended to impose adverse changes in the terms upon which they proposed to purchase goods or services from the Company, (iii) that they intended to modify their volume of purchases from the Company in 2011 by more than $100,000 as compared to 2010 levels, or (iv) of changes otherwise reflecting a Material Adverse Effect on the business relationship between any such Material Customer and the Company.

80.      As a result of the untrue statements and omissions, as alleged above, the Stockholder Defendants have breached the SPA, Section 3.02(r)(i) and Section 3.02(w).

81.      The SPA was and is valid and enforceable against Defendants.

82.      Plaintiff has fully performed its obligations under the SPA.

83.      By virtue of the Stockholder Defendants' breach of the SPA, Plaintiff has been injured and sustained damages in an amount to be determined at trial.

**WHEREFORE**, Plaintiff respectfully requests judgment against the Stockholder Defendants, as follows:

(1)      That the Court enter judgment against the Stockholder Defendants, and find that said Defendants breached the SPA with Plaintiff;

(2)      That the Court award damages to Plaintiff and against the Stockholder Defendants in an amount to be determined at trial, plus prejudgment interest; and

(3)      That the Court grant to Plaintiff such other and additional relief as is just and proper under applicable law.

**COUNT II**
**(Violation of Delaware Uniform Securities Act: Omissions of Material Fact)**
**Against The Stockholder Defendants**

84.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 83 above as if set forth herein.

85.  Plaintiff entered into the SPA as a Delaware corporation, PBE Acquisition, Inc.

86.  The PBE Stock sold to Plaintiff is a security as defined by the Delaware Uniform Securities Act, 6 Del. Code Ann. § 73-103(20).

87.  The Stockholder Defendants sold the Stock to the Plaintiff by means of untrue statements or material fact, specifically the statements in Section 3.02(r)(i) of the SPA, whereby the Stockholder Defendants represented that there were no material changes in the Company's business relationship with any of its Material Customers, that it had not received notice from its Material Customers of their intention (i) to make material reductions in any purchases from the Company, (ii) to impose adverse changes in the terms upon which they proposed to  purchase goods or services from the Company, or (iii) to make modifications of the volume of purchases from the Company in 2011 by more than $100,000 as compared to 2010 levels, and that there were no changes otherwise reflecting a Material Adverse Effect on the business relationship between any such Material Customer and the Company.

88.  Schedule 3.02(r)(i) of the SPA makes no exceptions for any material change in the Company's business relationship with any of its Material Customers and does not provide a description of any  notice received by the Company from any Material Customers of their intention to (i) make material reductions in any purchases from the Company, (ii) impose adverse changes in the terms upon which they proposed to purchase goods or services from the Company, or (iii) make modifications of the volume of purchases from the Company in 2011 by more than

$100,000 as compared to 2010 levels, or of changes otherwise reflecting a Material Adverse

Effect on the business relationship between any such Material Customer and the Company.

89.      As of the signing of the SPA, Stockholder Defendants knew or should have

known that there were existing material changes in the Company's business relationship with its

Material Customers and that the Company had received notice from PBE's Material Customers

(i) that they intended to make material reductions in purchases from the Company, (ii) that they

intended to impose adverse changes in the terms upon which they proposed to purchase goods or

services from the Company, (iii) that they intended to modify their volume of purchases from the

Company in 2011 by more than $100,000 as compared to 2010 levels, or (iv) of changes

otherwise reflecting a Material Adverse Effect on the business relationship between any such

Material Customer and the Company.

90.      The Stockholder Defendants violated the Act by obtaining money through the sale

of the Stock by means of untrue statements of material fact.

91.      The Stockholder Defendants' actions constitute a violation of the Delaware

Uniform Securities Act, 6 Del. Code § 73-201 and § 73-605(a)(2).

        **WHEREFORE**, Plaintiff respectfully requests judgment against the Stockholder

Defendants, as follows:

    (1)    That the Court enter judgment against Stockholder Defendants, and find
           that the Stockholder Defendants violated the Delaware Uniform Securities
           Act, 6 Del Code § 73-201 and § 73-605(a)(2);

    (2)    That the Court award such equitable relief as may be entitled to the
           Plaintiff and against the Stockholder Defendants as provided by Del.
           Code. Ann. 6 Del. Code § 73-605(a)(2), and as shown by the evidence at
           trial;

(3) .    That the Court award Plaintiff interest and its reasonable attorneys' fees pursuant to 6 Del. Code Ann. § 73-605(a)(2); and

(4)    That the Court grant to Plaintiff such other and additional relief as is just and proper under applicable law.

## COUNT III
### (Violation of Delaware Uniform Securities Act: Omission of Material Facts)
### Against The Stockholder Defendants

92.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 91 above as if set forth herein.

93.    Plaintiff entered into the SPA as a Delaware corporation, PBE Acquisition, Inc.

94.    In connection with the sale of said securities to Plaintiff, the Stockholder Defendants, individually and through their agents, furnished Plaintiff with untrue representations and warranties, specifically those contained in Section 3.02(r)(i) of the SPA.

95.    The Stockholder Defendants, individually and through their agents, omitted to state in the SPA material facts necessary in order to make the untrue representations and warranties that were made, in the light of the circumstances under which they were made, not misleading.

96.    Schedule 3.02(r)(i) of the SPA makes no exceptions for any material change in the Company's business relationship with any of its Material Customers and does not provide a description of any notice received by the Company from any Material Customers of their intention to (i) make material reductions in any purchases from the Company, (ii) impose adverse changes in the terms upon which they proposed to  purchase goods or services from the Company, or (iii) make modifications of the volume of purchases from the Company in 2011 by more than $100,000 as compared to 2010 levels, or of changes otherwise reflecting a Material

Adverse Effect on the business relationship between any such Material Customer and the Company.

97.     In reliance on the untrue representations and warranties of the Stockholder Defendants, and the nondisclosure by the Stockholder Defendants of material facts in the SPA necessary in order to make the untrue representations and warranties that were made not misleading, Plaintiff purchased the Stock at an artificially inflated price.

98.     The Stockholder Defendants violated the Act by procuring the sale and sale of the Stock through their failure to state material facts in the SPA necessary to make the Stockholder Defendants' untrue representations and warranties not misleading.

99.     The Stockholder Defendants' actions constitute a violation of the Delaware Uniform Securities Act, 6 Del. Code § 73-201 and § 73-605(a)(2).

**WHEREFORE**, Plaintiff respectfully requests judgment against Defendants, as follows:

(1)     That the Court enter judgment against Defendants, and find that the Stockholder Defendants violated the Delaware Uniform Securities Act, 6 Del Code § 73-201 and § 73-605(a)(2);

(2)     That the Court award such equitable relief as may be entitled to the Plaintiff and against the Stockholder Defendants as provided by Del. Code. Ann. 6 Del. Code § 73-605(a)(2), and as shown by the evidence at trial;

(3) .   That the Court award Plaintiff interest and its reasonable attorneys' fees pursuant to 6 Del. Code Ann. § 73-605(a)(2); and

(4)     That the Court grant to Plaintiff such other and additional relief as is just and proper under applicable law.

**COUNT IV**
**(Violation of Delaware Uniform Securities Act: Control Person Liability)**
**Against the Control Person Defendants and the Fetterolf Group**

100.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 99 above as if set forth herein.

101.     Plaintiff entered into the SPA as a Delaware corporation, PBE Acquisition, Inc.

102.     At all time periods relevant to this Complaint, the Control Person Defendants acted as trustees of the Stockholder Defendants, were officers and directors of PBE, and/or occupied a similar status or performed similar functions thereof, and thus were control persons within the meaning of the Delaware Securities Act, 6 Del. Code § 73-605(b), and are therefore jointly and severally liable for the conduct alleged in this Complaint.

103.     The Control Person Defendants knew or in the exercise of reasonable care could have known at the time of the acquisition of the Stock that the representations and warranties in Section § 3.02(r)(i),of the SPA were untrue and misleading, and contained omissions of material fact that that if revealed would have made the untrue statements not misleading.

104.     The Fetterolf Group, owned and controlled by the Control Person Defendants, materially aided in the sale of the Stock, and  knew or in the exercise of reasonable care could have known at the time of the acquisition of the Stock that the representations and warranties in Section § 3.02(r)(i),of the SPA were untrue and misleading, and contained omissions of material fact that that if revealed would have made the untrue statements not misleading.

105.     The Control Person Defendants and the Fetterolf Group collectively participated in the drafting, preparation, approval, and dissemination of the representations and warranties complained of herein.

106.     The Control Person Defendants are liable under the Act for having controlled, directly or indirectly, the Stockholder Plaintiffs, and for having materially aided as an agent of the Stockholder Defendants the sale of the Stock to the Plaintiff by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

107.     The Fetterolf Group is liable under the Act for having materially aided as an agent of the Stockholder Defendants the sale of the Stock to the Plaintiff by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

108.     The Control Person Defendants' and the Fetterolf Group's actions constitute a violation of the Delaware Uniform Securities Act, , 6 Del. Code § 73-201 and § 73-605(a)(2).

**WHEREFORE**, Plaintiff respectfully requests judgment against the Control Person Defendants and the Fetterolf Group as follows:

(1)     That the Court enter judgment against these Defendants, and find that said Defendants violated the Delaware Uniform Securities Act, 6 Del Code § 73-201 and § 73-605(a)(2) and (b);

(2)     That the Court award such equitable relief as may be entitled to the Plaintiff and against the Stockholder Defendants as provided by Del. Code. Ann. 6 Del Code § 73-605(a)(2) and (b), and as shown by the evidence at trial;

(3) .    That the Court award Plaintiff interest and its reasonable attorneys' fees pursuant to 6 Del. Code Ann. § 73-605(a)(2) and (b); and

(4)     That the Court grant to Plaintiff such other and additional relief as is just and proper under applicable law.

## COUNT V
### (Declaratory Judgment - Indemnification)
### Against the Stockholder Defendants

109.      Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 108 above as if set forth herein.

110.      Under the terms of the SPA, Section 10.02(a)(i)-(iii), the Stockholder Defendants agreed that:

> [E]ach Stockholder, jointly and severally with respect to claims to be satisfied from the Stockholder Escrow Amount, the Working Capital Escrow Amount and/or the Tax Escrow Amount, and individually and severally, solely with respect to such Stockholder with respect to all other claims, shall indemnify, defend and hold each of the Buyer Indemnified Parties and, following the Closing, the Company, harmless from and against any and all:
>
> (i)    Losses resulting from breaches of representations and warranties made by or on behalf of the Stockholders in Section 3.02 in this Agreement or in any document delivered hereunder;
>
> (ii)   Losses resulting or arising out of any and all breaches of covenants, agreements and/or certifications made by or on behalf of the Stockholders in this Agreement or other Transaction Documents;
>
> (iii)  Losses based upon, arising out of or caused by any fraud or willful misconduct of any of the Stockholders.

111.      By letter dated November 7, 2011, Plaintiff submitted a notice of claim to Defendants and the Escrow Agent for losses exceeding the full amount of the Escrow Account ($5.1 million) (the "Claim Notice").

112.      By letter dated December 2, 2011, Defendants, through their legal counsel, notified Plaintiff that they disputed and denied the Claim Notice, and further demanded a formal withdrawal of the Claim Notice.

113.     In a response letter dated February 15, 2012, Plaintiff reiterated its claim for damages.

114.     By virtue of Stockholder Defendants' breach of the SPA, Plaintiff has been injured and sustained losses, as described in Section 10.02(a)(i)-(iii) of the SPA.

     **WHEREFORE**, Plaintiff respectfully requests judgment against the Stockholder Defendants, as follows:

(1)     That the Court enter judgment against the Stockholder Defendants, and find that the Stockholder Defendants caused Plaintiff to incur losses as detailed in Section 10.02(a)(i)-(iii) of the SPA;

(2)     That the Court award damages to Plaintiff in an amount to be determined at trial, plus prejudgment interest, and order the Stockholder Defendants to indemnify Plaintiff in the full amount of the Escrow Account; and

(3)     That the Court grant to Plaintiff such other and additional relief as is just and proper under applicable law.

DATED:  April 15, 2013                    Respectfully submitted,

                                          PYOTT-BOONE ELECTRONICS INC.,
                                          (f/k/a PBE ACQUISITION, INC.)


                                          By:   /s/ Paul W. Jacobs, II

                                          Paul W. Jacobs, II (VSB No. 16815)
                                          Warren David Harless (VSB No.20816)
                                          Roman Lifson (VSB No. 43714)
                                          Nichole Buck Vanderslice (VSB No. 42637)
                                          Christian & Barton, LLP
                                          909 East Main Street, Suite 1200
                                          Richmond, VA 23219
                                          Tel.: (804) 697-4110/Fax: (804) 697-6110
                                          *Of counsel*

                                          Eric D. Brandfonbrener
                                          (admitted *pro hac*)
                                          Jose Lopez
                                          (admitted *pro hac*)
                                          Perkins Coie LLP
                                          131 S. Dearborn, Suite 1700
                                          Chicago, IL 60603
                                          Tel.: (312) 324-8400/Fax: (312)324-9400
                                          *Counsel for Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

I, Paul W. Jacobs, II, hereby certify that on April 15, 2013, a true and correct copy of the

foregoing **PLAINTIFF'S FIRST AMENDED COMPLAINT** was filed electronically with the

Western District of Virginia – Abingdon Division.  Notice of this filing has been sent by

operation of the Court's electronic filing system to all parties indicated on the electronic filing

receipt.  Parties may access this filing through the Court's ECF system.


_____/s/ Paul W. Jacobs, II_____

1389482.2